Linda HASTINGS, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 61A01–9001–CR–13.

Court of Appeals of Indiana,
First District.

Oct. 9, 1990.

David O. Thomas, Public Defender, Brazil, for appellant.

Linley E. Pearson, Atty. Gen., Louis E. Ransdell, Deputy Atty. Gen., Office of Atty. Gen., Indianapolis, for appellee.

ROBERTSON, Judge.

Linda Hastings appeals her conviction for neglect of a dependent, a class B felony.[1] We reverse.

On April 23, 1988, Linda Hastings' two-year-old son, Jimmy, was injured by Hastings' boyfriend, Richard Kelley. While

---

1. IND.CODE 35-46-1-4.

Hastings went to get food for the three-some, she left Jimmy with Kelley for approximately twenty-five minutes. When Hastings returned, Jimmy had suffered a broken arm. Kelley initially said that Jimmy broke his arm when running toward his mother as she left the house. However, on June 4, 1988, Kelley confessed that he had "jerked Jimmy up by his arm" when the boy would not stop crying, and in the process broke Jimmy's arm.

Kelley had injured Jimmy on a prior occasion. When Kelley confessed to the 1988 arm-breaking episode, he also confessed that on July 14, 1987, while on a visit to his parents' house in Hendricks County, he had "flipped" Jimmy onto the bed when the boy would not stop crying. As a result of this treatment, both Jimmy's legs were broken. Hastings was not at Kelley's parents' house when this incident took place.

On July 16, 1987, a CHINS[2] action was commenced pursuant to IND.CODE 31–6–1–1 et seq. on behalf of Jimmy, based on the July 14, 1987, incident in which Jimmy's legs were broken. Also based on this incident, Hastings was charged with neglect of a dependent to which she pleaded guilty on November 16, 1987. Jimmy was placed in foster care. During the course of the CHINS action Hastings was required by court order and under statutory law to meet and cooperate with Salley Curley, the welfare worker assigned to Jimmy's case, in order to regain custody of Jimmy.

During the CHINS hearing, Hastings was advised that one possible result of the proceedings could be termination of her parental rights and that her cooperation was necessary to avoid such an outcome. During one of these meetings, Curley asked Hastings whether or not she suspected Kelley of having broken Jimmy's legs in 1987. Curley testified at trial that Hastings responded that "she was suspicious but she didn't want to think that he had done it," and that Kelley had had the "opportunity" to have injured Jimmy because Kelley was alone with Jimmy on the day the injury occurred. Salley Curley testified that this discussion took place prior to the April 23, 1988, incident in which Kelley broke Jimmy's legs.[3] Pursuant to the welfare department's orders, Hastings was required to keep Jimmy away from Kelley when Jimmy was visiting his mother.

On May 17, 1988, Hastings was charged by information with neglect of a dependent based on the April 23, 1988, incident in which Kelley broke Jimmy's arm. On October 27, 1988, the Parke County Department of Welfare filed a petition to terminate Hastings' parental rights in regard to Jimmy. This petition was granted, and is presently undergoing appeal. On August 21, 1989, Hastings was convicted for neglect of a dependent and was eventually sentenced to ten (10) years imprisonment, all of which was suspended. Hastings was placed on probation for a period of five years.

Hastings argues on appeal that Curley should not have been permitted to testify concerning statements made by Hastings during the CHINS proceeding because such testimony violated Hastings' constitutionally protected right against self-incrimination. Hastings also argues that the trial court erred in allowing into evidence her prior conviction for criminal neglect.

 In order to obtain a conviction for neglect of a dependent, the State must show that the accused was subjectively aware of a high probability that the ac-

2. Child in Need of Services.

3. Contrary to Hastings' claim on appeal, Curley's testimony regarding the timing of Hastings' admission that she suspected Kelley of having injured Jimmy was not uncertain. Curley consistently testified that this discussion took place prior to April 23, 1988. The only statement which Curley could not place as having taken place prior to the leg-breaking incident concerned Kelley's opportunity to harm Jimmy while Jimmy was being bathed to reduce a fever. This statement cannot be termed an "admission" or "confession" because Hastings spoke only of Kelley's *opportunity* to harm Jimmy at this time, not of her *suspicion* or *knowledge* that Kelley did indeed harm Jimmy while watching the boy. In any case, exactly when this discussion took place is irrelevant because Hastings was describing her appreciation of the danger involved in leaving Jimmy with Kelley by admitting that she suspected Kelley was responsible for the 1987 leg-breaking incident.

cused placed the dependent in a dangerous situation. I.C. 35–46–1–4(a)(1); *Hill v. State* (1989), Ind., 535 N.E.2d 153, 154; *Fisher v. State* (1990), Ind.App., 548 N.E.2d 1177, 1179. To make such a showing the State need only prove that the accused was aware of facts which would alert a reasonable parent under the circumstances to take affirmative action to protect the child. *Smith v. State* (1980), Ind.App., 408 N.E.2d 614, 621. Such a determination requires that the fact finder resort to inferential reasoning to ascertain the mental state of the accused. *Hill*, 535 N.E.2d at 154. The courts will look to all the surrounding circumstances of the case when making this determination. *Id.*

In an effort to prove that Hastings possessed the requisite state of mind, the State had welfare caseworker Curley testify as to the content of conversations held with Hastings during the course of the CHINS proceeding. Prior to the April, 1988, arm-breaking incident and prior to the filing of neglect charges against Hastings, Hastings told Curley that she did have suspicions that Kelley was responsible for breaking Jimmy's legs on July 14, 1987. At trial, Hastings objected to Curley's testimony, alleging Curley's revelation violated Hastings' right against self-incrimination and constituted an involuntary confession because Hastings was under compulsion when she made the statements recited by Curley at trial.

■ Hastings correctly notes that the Fifth Amendment of the Constitution of the United States, as well as Art. I, § 14 of the Indiana Constitution, provides that persons shall be free from being compelled to make disclosures that might subject them to criminal prosecution or that might aid in convicting them. *See Dickson v. State* (1989), Ind., 533 N.E.2d 586, 587 (quoting *Corder v. State* (1984), Ind.App., 467 N.E.2d 409, 415). When reviewing cases involving involuntary disclosures, the Supreme Court of the United States has stated that "[t]he range of inquiry in this type of case must be broad," and that "judgment in each instance [must] be based upon consideration of 'the totality of the circum-

stances.'" *Blackburn v. Alabama* (1960), 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242; *see Light v. State* (1989), Ind., 547 N.E.2d 1073, 1077; *Smith v. State* (1989), Ind., 543 N.E.2d 634, 637. A review of constitutional involuntariness is a question of law, not of fact, and will be decided by the court rather than the trier of fact. *Light*, 547 N.E.2d at 1077. To admit a confession into evidence in the State of Indiana, the State must prove beyond a reasonable doubt that the defendant knowingly and intelligently waived his right not to incriminate himself. *Stanger v. State* (1989), Ind.App., 545 N.E.2d 1105, 1109. In determining whether the State has met this burden, a court on appeal will take into consideration the entire record. *Light*, 547 N.E.2d at 1077.

■ Those confessions made through inducement, violence, threats or other improper influences meant to overcome the free will of the accused will be deemed involuntary. *Townsend v. State* (1989), Ind., 533 N.E.2d 1215, 1222, *cert. denied,* — U.S. ——, 110 S.Ct. 1327, 108 L.Ed.2d 502; *see also Smith*, 543 N.E.2d at 637 (confession not voluntary if it is the product of threats, physical abuse, or direct or implied promises.) An objection to the general voluntariness of a confession requires application of the constitutional standard of the Due Process Clause of the Fourteenth Amendment which forces this court to focus on whether the behavior of the State's law enforcement officials was such as to overcome the defendant's "will to resist and bring about confessions not freely self-determined." *Rogers v. Richmond* (1961), 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760; *Smith*, 543 N.E.2d at 637. In making this determination, the Supreme Court noted that "coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition." *Blackburn*, 361 U.S. at 206, 80 S.Ct. at 280; 4 L.Ed.2d at 248. Furthermore, "[t]here is torture of the mind as well as the body; the will is as much affected by fear as by force." *Watts v. Indiana* (1949), 338 U.S. 49, 52, 69 S.Ct. 1347, 1349, 93 L.Ed. 1801. In short:

"The ultimate test remains that which has been the only clearly established test in Anglo–American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process."

*Culombe v. Connecticut* (1961), 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037.

■ In reviewing Hastings' claims that her statements concerning her suspicions about Kelley's responsibility for Jimmy's injuries should not have been allowed into evidence because such statements constituted an involuntary confession, we must address two questions: (1) was the caseworker who questioned Hastings pursuant to the CHINS proceeding acting as "an agency of the government in the course of securing a conviction" *Blackburn*, 361 U.S. at 206, 80 S.Ct. at 280, 4 L.Ed.2d at 248; and (2) was Hastings' statement given involuntarily?

The Fifth Amendment guarantee against self-incrimination protects defendants from official state misconduct which results in an involuntary confession. In the present case, the caseworker testified that she understood that she was obligated to cooperate with the prosecutors and to turn over any evidence received concerning the criminal charges against Hastings. Further, I.C. 31–6–4–8(c) requires an intake officer in a CHINS proceeding to send to the prosecutor or county attorney a copy of the preliminary inquiry made by the caseworker. Additionally, I.C. 31–6–2–1.1(c)(1) states that "[a] juvenile court has concurrent original jurisdiction in cases involving adults charged with the crime of neglect of a dependent (I.C. 35–46–1–4)." While not expressly given law enforcement status, the level of cooperation between the Department of Public Welfare in a CHINS proceeding and the police and prosecutor's office in a related criminal proceeding is such that any effort to deny a caseworker's status as an agent of the state in these cases would be ludicrous. We move therefore to our next level of inquiry.

We now examine whether Hastings' statement concerning her suspicion that Kelley was responsible for Jimmy's injuries was made under compulsion so as to require the statement be characterized as an involuntary confession.[4] In her appellate brief Hastings argues that the statement she made to the caseworker was not voluntary because Hastings was ordered by the CHINS court and mandated by statute to participate and cooperate with the welfare department's CHINS investigation and pro-

---

**4.** At this juncture it is important that we note a recent U.S. Supreme Court case in which it was held that even where a production order will compel testimonial assertions that may prove to be incriminating, the Fifth Amendment privilege may not be invoked to resist compliance with a regulatory regime construed to effect the State's public purposes unrelated to the enforcement of its criminal laws. *Baltimore Department of Social Services v. Bouknight* (1990), — U.S. ——, 110 S.Ct. 900, 107 L.Ed.2d 992. The Supreme Court then characterized the state of Maryland's statutory scheme for children in need of assistance as a regulatory system for the care and safety of children, *id.* 110 S.Ct. at 907, not directed to a "selected group inherently suspect of criminal activities." *Id.* 110 S.Ct. at 906. However, the Court then stated:

"We are not called upon to define the precise limitations that may exist upon the State's ability to use the testimonial aspects of Bouknight's act of production in subsequent criminal proceedings. But we note that imposition of such limitations is not foreclosed. The same custodial role that limited the ability to resist the production order may give rise to corresponding limitations upon the direct and indirect use of that testimony. The State's regulatory requirement in the usual case may neither compel incriminating testimony nor aid a criminal prosecution, but the Fifth Amendment protections are not thereby necessarily unavailable to the person who complies with the regulatory requirement after invoking the privilege and subsequently faces prosecution."

*Id.* 110 S.Ct. at 908. Therefore, while the holding in *Bouknight* would effectively prevent Hastings from invoking the Fifth Amendment right against self-incrimination during the CHINS proceeding itself, the Supreme Court expressly acknowledged that the Fifth Amendment may be invoked to limit the admission into evidence of incriminating statements made during the CHINS investigation in a subsequent criminal proceeding.

ceedings. Specifically, Hastings notes that under I.C. 31–6–4–13.5(e) a parent may be required to participate in a court ordered case plan and may be held financially responsible for any services provided a child. Furthermore, during a period of informal adjustment the statutory authority provides that a parent *must* agree to a welfare department program. I.C. 31–6–4–12(b). Also, under I.C. 31–6–4–15.8, a parent may be ordered to "work with any person providing care, treatment, or rehabilitation for the child." Finally, Hastings cites I.C. 31–6–4–17(d) which requires that a parent be advised that failure to participate in a court ordered case plan can lead to the termination of the parent-child relationship. According to Hastings, an individual's "will to resist" the caseworker's inquiries is greatly affected by this statutory scheme and the resulting intense psychological pressure worked upon the parent of a child who may be deemed a child in need of services.

We note the following language of the Supreme Court in discussing a related issue:

> "The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their children to the state. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life."

*Lassiter v. Department of Social Services* (1981), 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640. Given this vital interest in the preservation of an individual's parental rights, we agree that if the evidence before us reflects that Hastings' statements were made only in response to threats, however real, made by the interviewing caseworker, indicating that Hastings' parental rights could be terminated if she failed to cooperate, then the totality of the circumstances would suggest that Hastings' statements were made under compulsion.

Upon reviewing the record we find that case plans were developed, and that Hastings was under court order to do "any and all necessary things" to carry out the recommended case plan. Therefore, we presume that the trial court in the CHINS proceeding carried out its duty dictated under I.C. 31–6–4–17(d) to advise Hastings that her failure to cooperate with the implementation of these plans could result in the termination of her parental rights.[5] Given this great mental pressure, we must conclude that Hastings' capacity for self-determination was "critically impaired," and the State failed to prove beyond a reasonable doubt that Hastings' statement constituted a voluntary confession.[6]

---

5. *See Ake v. National Education Association* (1988), Ind.App., 531 N.E.2d 1178, 1179 (presumption is that courts correctly apply law.)

6. Because we reverse Hastings' conviction based upon a violation of the Fifth Amendment, we need not address Hastings' argument that the statements she made concerning her suspicions of Kelley were inadmissible because she was not given the *Miranda* advisements. However, we will take this opportunity to point out that the *Miranda* advisements need only be given where "a person has been taken into custody" or is "deprived of his freedom of action in any significant way." *Miranda v. United States* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. In the present case, Hastings was not in physical custody when she was questioned by the welfare caseworker. The discussions took place at Hastings' home and the caseworker's office. There is no indication that Hastings' ability to abandon the discussions was in any way hampered by the physical surroundings or atmosphere in which the discussions took place.

Hastings argues, however, that because she was under court order and statutorily required to cooperate with the caseworker her "freedom of action" was significantly impaired and she was, therefore, undergoing a custodial interrogation. Assuming without deciding that this type of "coercive atmosphere" is that which was contemplated by the Supreme Court when it imposed the *Miranda* procedural safeguards to prevent the eliciting of involuntary confessions during "custodial interrogation," we note that the Fifth Amendment in conjunction with the Due Process Clause prohibits the use of confessions gained in such an atmosphere in the first instance, making a subsequent *Miranda* analysis based on the same concerns redundant. We further note that if one does not agree that the type of compulsion under which Hastings made her statements creates a violation of the Fifth Amendment, then in the present case there is no way a custodial interrogation can be found to exist and a *Miranda* analysis is not applicable.

Furthermore, if a *Miranda* analysis is employed there is also some doubt concerning the

■ The admission into evidence of an involuntary confession constitutes fundamental error and requires a reversal of the defendant's conviction. *Mincey v. Arizona* (1978), 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290; *Chapman v. California* (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. Hastings argues not only that her conviction must be reversed, but that double jeopardy concerns should bar a retrial on the charge of neglect of a dependent levelled against her. Hastings concedes that the general rule is that retrial of the defendant is permissible when the conviction is reversed on grounds other than sufficiency of the evidence. *See William v. State* (1989), Ind., 544 N.E.2d 161, 163. However, Hastings claims that absent evidence of her confession the evidence before the trial court was insufficient to support her conviction for neglect of a dependent, and that, therefore, retrial should be prohibited. We disagree. The inferences that can be drawn from the record indicate that pursuant to the CHINS proceeding involving Jimmy, Hastings was under court order not to live with Kelley because of Kelley's violent tendencies. Given this evidence, a jury could determine that Hastings knowingly left Jimmy in a dangerous situation, thereby committing neglect of a dependent, when she left Jimmy alone with Hastings in April, 1988. *See* I.C. 35–46–1–4(a)(1). Therefore, we reject Hastings' argument, and refuse to limit the State's ability to retry Hastings.

■ Finally, Hastings argues that the trial court erred in admitting into evidence her prior guilty plea to neglect of a dependent.[7] Hastings contends, and the State concedes, that generally evidence of other crimes or bad acts is inadmissible. *See Clark v. State* (1989), Ind., 536 N.E.2d 493, 494; *Gibbs v. State* (1989), Ind., 538 N.E.2d 937, 939. However, evidence of other criminal activity may be admitted for the purpose of showing intent, motive, purpose, identification, common scheme or plan or a depraved sexual instinct. *Johnson v. State* (1989), Ind.App., 544 N.E.2d 164, 168. In order to be admissible under one of these exceptions, the probative value of the evidence must exceed its prejudicial impact. *Id.*

■ In the present case, the State offered into evidence Hastings' prior guilty plea to neglect of a dependent not to show that Hastings "ha[d] a propensity to engage in criminal conduct." *Id.* at 168. Nor was the State attempting to imply that simply because Hastings committed neglect of a dependent once, she was guilty of having done so again. *Clark*, 536 N.E.2d at 495.

Rather, Hastings' prior plea of guilty to neglect of a dependent was based on a factual situation nearly identical to that presently before us; on July 14, 1987, Hastings left Jimmy alone with Kelley, and Jimmy suffered broken bones. As stated previously in this opinion an element necessary to prove neglect of a dependent is that the accused be subjectively aware of a high probability that the accused placed the dependent in a dangerous situation. I.C. 35–46–1–4(a)(1). Evidence that Hastings had once before pleaded guilty to a charge of neglect of a dependent due to Kelley's physical abuse of Jimmy constitutes very compelling evidence that Hastings knew that leaving Jimmy with Kelley could have disastrous results. Under these circumstances, we conclude that the probative value of such evidence far outweighed any prejudicial effect, and uphold the trial

existence of an interrogation in the present case. Unless one agrees that the caseworker was an agent of the State working in conjunction with the prosecutor's office in obtaining a criminal conviction against Hastings, it is impossible to interpret the discussion between Hastings and the caseworker as an interrogation. Of course, absent an interrogation, no *Miranda* warnings would be required. *See id.; see also Escobedo v. Illinois* (1964), 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359. In short, the *Miranda* analysis put forth by the appellant was either redundant or inappropriate.

7. We note that since we reverse Hastings' conviction based on Fifth Amendment grounds, technically we need not address this issue on appeal. However, because this issue is likely to arise again in the event of a retrial, we will review the question of whether or not the trial court erred in admitting evidence of Hastings' prior conviction for neglect of a dependent.

court's decision to admit evidence of Hastings' prior guilty plea into evidence.

## CONCLUSION

The trial court erred in admitting evidence of Hastings' comments concerning her suspicions of Kelley because such evidence violated Hastings' Fifth Amendment right against self-incrimination. We further find that while such an error is fundamental and requires reversal of Hastings' conviction, double jeopardy concerns would not preclude Hastings from being retried on the charge of neglect of a dependent. We also hold that the trial court did not err in admitting evidence of Hastings' prior conviction for neglect of a dependent where such evidence bears a direct relationship to a necessary element of the proof scheme for the neglect of a dependent charge presently before the court.

Judgment reversed.

BUCHANAN, J., concurs.

BAKER, J., concurs with separate opinion.

BAKER, Judge, concurring.

I fully concur with the majority's decision with respect to the conclusions that Hastings' statement did not constitute a voluntary confession and that the trial court properly admitted into evidence Hastings' prior guilty plea to neglect of a dependent. I write separately to indicate that had the State introduced the factual basis surrounding Hastings' prior guilty plea to neglect of a dependent and had that factual basis indicated that she admitted she was negligent in allowing Kelley to be around Jimmy, I would disagree that her conviction of the second neglect of a dependent charge must be reversed. This factual basis underlying the guilty plea would have been the practical equivalent of Hastings' statements, that she suspected Kelley of injuring Jimmy, and thus rendered the admission of the statements harmless. *See Hensley v. State* (1986), Ind., 499 N.E.2d 1125.

The State, however, did not introduce the guilty plea transcript, which it had at its disposal, and it is impossible to tell upon what factual basis Hastings' prior guilty plea rests. I, therefore, reluctantly agree her conviction must be reversed because the error in admitting Hastings' statements to the welfare worker was not harmless beyond a reasonable doubt, despite the overwhelming admissible evidence of her guilt. *Chapman v. California* (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705; *Clark v. State* (1984), Ind., 465 N.E.2d 1090.