## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 18 2018, 10:55 am

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joshua Flowers
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Angela Sanchez
Assistant Section Chief, Criminal Appeals
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Evan D. Huntsinger, *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff.* | December 18, 2018 <br><br> Court of Appeals Case No. 36A05-1707-CR-1610 <br><br> Appeal from the Jackson Circuit Court <br><br> The Honorable Richard W. Poynter, Judge <br><br> Trial Court Cause No. 36C01-1604-F3-7 |

**Najam, Judge.**

# Statement of the Case

Evan D. Huntsinger appeals his convictions for battery, as a Level 3 felony; neglect of a dependent, as a Level 3 felony; and three counts of neglect of a dependent, each as a Level 6 felony. Huntsinger raises five issues for our review, which we restate as follows:

1.  Whether Huntsinger preserved for appellate review his argument that the trial court abused its discretion when it admitted into evidence a forensic interview of Kh.H., a step-sibling of Huntsinger's victim.

2.  Whether the trial court abused its discretion when it denied Huntsinger's motion for a mistrial.

3.  Whether the State presented sufficient evidence to support Huntsinger's three convictions for Level 6 neglect of a dependent.

4.  Whether Huntsinger's convictions for battery, as a Level 3 felony, and neglect of a dependent, as a Level 3 felony, violate Indiana's prohibitions against double jeopardy.

5.  Whether the trial court abused its discretion when it sentenced Huntsinger to an aggregate term of nine years with five years suspended.

We affirm in part, reverse in part, and remand with instructions.

## Facts and Procedural History

[3]    In February of 2016, Huntsinger and Lindsey Huntsinger were married, living together in Seymour, and had an infant son, L.H., who was just shy of seven months old. They lived with Huntsinger's other minor children, Kh.H. and Ki.H., and Lindsey's other minor child, J.W. Kh.H., the oldest child, was four years old at the time.

[4]    L.H. was "a healthy baby." Jury Trial Tr. Vol. 1 at 224. Lindsey "never saw [L.H.] fall or strike his own head or get injured in any way." *Id.* at 240. The children in the house "all got along pretty well," and "none of them ever hit [L.H.]" *Id.* at 240-41.

[5]    While everyone was at home during the afternoon of February 22, Lindsey stepped outside to smoke a cigarette. When she went outside, Huntsinger was inside "holding [L.H.] to give him a bottle." *Id.* at 234. Kh.H., Ki.H., and J.W. "were awake on the couch" in the same "area where [Huntsinger] was." *Id.*

[6]    While she was outside, Lindsey "could hear [L.H.] inside being fussy." *Id.* at 236. Not more than four minutes after she had gone outside, Huntsinger came out holding L.H. and saying that L.H. needed to go to the hospital. Lindsey observed that L.H. "was completely limp." *Id.* Huntsinger told Lindsey that he had been "feeding [L.H.] a bottle and trying to burp [L.H.] and [L.H.] just went limp." *Id.* at 237.

[7]     Lindsey rushed L.H. to the Schneck Medical Center in Seymour. There, medical personnel observed that L.H. was "seizing," which "in an infant you have to assume . . . [is] really serious" as it can "indicate some kind of brain damage . . . ." *Id.* at 178-79. Dr. Onyekachi Nwabuko ordered a CT scan of L.H.'s brain, which immediately revealed a "big bleed" on L.H.'s brain that "was actually shifting the brain from one side to the other . . . ." *Id.* at 184. The medical personnel at Schneck provided care to L.H. until he was transferred to Riley Children's Hospital in Indianapolis.

[8]     At Riley, Dr. Tara Harris ordered an MRI and a skeletal survey of L.H., which revealed among other things that L.H. had also suffered rib fractures. Dr. Harris also conducted tests that ruled out a bleeding disorder as a cause for L.H.'s brain bleed. As a result of her examination of L.H., Dr. Harris concluded that L.H. had suffered "abusive head trauma," which "we used to call Shaken Baby Syndrome." Jury Trial Tr. Vol. 2 at 221. As she later explained, "with [L.H.] the fact that he ha[d] subdural[ hematomas] and subarachnoid[] and retinal hemorrhages and posterior rib fractures, all of those together can only be explained by abuse." *Id.* at 223-24.

[9]     On February 23, case workers for the Indiana Department of Child Services removed the children from the home. J.W. was placed with his biological father, Cole Williamson. On at least one occasion shortly thereafter, J.W. told Williamson that Huntsinger had "hit [his] brother" L.H. *Id.* at 109. And, on February 26, Stephanie Back conducted a recorded forensic interview of Kh.H.

at the Child Advocacy Center of Southeastern Indiana. In that interview, Kh.H. stated that she had seen Huntsinger shake L.H. on February 22.

[10] The State charged Huntsinger as follows: Count 1: battery, as a Level 3 felony; Count 2: neglect of a dependent (L.H.), as a Level 3 felony; Count 3: neglect of a dependent (Kh.H.), as a Level 6 felony; Count 4: neglect of a dependent (Ki.H.), as a Level 6 felony; and Count 5: neglect of a dependent (J.W.), as a Level 6 felony. At his ensuing jury trial, Lindsey and Williamson both testified. Kh.H. testified in person and stated that she saw Huntsinger "shooked [L.H.] too hard and hurt him real hard." *Id.* at 38. Kh.H. also testified that Huntsinger had told her not to tell anyone what he had done to L.H. The State also admitted into evidence L.H.'s medical records, and the State called L.H.'s treating physicians as witnesses. At the close of the State's case-in-chief, Huntsinger moved for a directed verdict on Counts 3, 4, and 5, which related to endangerment of Kh.H.'s, Ki.H.'s, and J.W.'s mental health from having been near L.H. during the February 22 battery. The trial court denied Huntsinger's motion.

[11] During Huntsinger's cross-examination of Kh.H., "some people in the audience" observed "the State communicate with one of the Jurors . . . ." *Id.* at 85. Huntsinger brought the matter to the court's attention outside the presence of the jury, and the prosecutor responded, "I know what he's talking about. You were asking one of the questions for like the tenth time and one of the Jurors was nodding her head because [Kh.H. had] answered it and I was like nodding my head too. Yeah." *Id.* The juror in question was an alternate juror.

The court brought that juror into the courtroom and asked her about the incident, and she stated that she remembered "looking" in the direction of the prosecutor because of the "repetition" of the questions and the "lengthy process" of the cross-examination for Kh.H. *Id.* at 87. She acknowledged that she had "nodded" her head and "made eye contact" with the prosecutor in an "[o]h my gosh" expression. *Id.* at 88.

[12] The court then admonished the juror that she was not to have "any kind of . . . communication . . . in any way" with anyone in the courtroom and that she was to instead "focus on the witness." *Id.* The court further told her that communication with others was "inappropriate." *Id.* The juror responded that she understood the court's admonishment. Huntsinger then moved for a mistrial, which the court denied.

[13] During his case-in-chief, Huntsinger attacked Kh.H.'s credibility. In particular, Huntsinger testified that Kh.H. was "on the sensory processing disorder spectrum" and that her perceptions are "like fantasy." Jury Trial Tr. Vol. 3 at 189-90. Huntsinger also called his own expert witness, Dr. Peter Dehnel, who testified that "it's incredibly difficult to get reliable testimony from kids" and that an inexperienced child interviewer can affect the reliability of a child's testimony. *Id.* at 135. After Huntsinger rested, the State on rebuttal moved to admit Kh.H.'s recorded forensic interview with Back to demonstrate Kh.H.'s credibility. Huntsinger objected to the admission of the forensic interview only on the ground that the court had simultaneously denied him his request to admit further evidence to challenge the interviewer. *Id.* at 230-50. The trial

court overruled Huntsinger's objection. The jury then found Huntsinger guilty as charged.

[14] At the conclusion of the ensuing sentencing hearing, the trial court found the following aggravating and mitigating circumstances:

> [O]bviously one of the things I consider when announcing a sentence is the nature and circumstances of the offense . . . . The problem in this situation is we don't know how [L.H.] will do, the child is just too young. The developmental injuries this child may have sustained will not be pronounced until probably the child is school . . . age, but the doctor was clear that there will be injuries to this child . . . . There is no doubt that this child will sustain long-term damage. The question is to what degree. . . . This child could've very easily died. . . . The injuries to this child were clear, the child was gripped . . . sufficiently to fracture the spinal area . . . . One of the things the State brought out . . . was involving the daughter. It's one thing to deny one's own guilt, but to me, getting a child, especially a child that you could tell was torn between a love for her father, trying to protect her father, not wanting to make her father mad and having to be ordered by a man in a black robe to answer questions. That was very concerning to me. Getting a child to lie or to cover for you because you don't want to admit your guilt really bothers me. And I don't doubt for a second this child is being honest in her testimony, what she saw. That, to me, is significant. Also, the . . . the victim's age . . . . The crime requires you to be over eighteen years of age for [b]attery, but it says a child under the age of fourteen. This child is substantially younger than the age of fourteen. This child was completely defenseless. Completely. . . . That, to me, is a significant factor. The fact that relates to Count 1 that you were in a position of trust for this child. . . . [Y]ou abused a position of trust involving this child. . . . That, to me, is another significant aggravating factor. What are the mitigating factors? The mitigators are the fact that

you have no criminal history. That is true. There could be some hardship on your family as a result of this, but I believe the seriousness of the offense outweighs any mitigation in this case.

Sent. Tr. at 28-31. The court then ordered Huntsinger to serve an aggregate term of nine years with five years suspended. This appeal ensued.

# Discussion and Decision

### Issue One: Forensic Interview

[15] On appeal, Huntsinger first asserts that the trial court violated Indiana's protected person statute, Ind. Code § 35-37-4-6 (2018), when it admitted Kh.H.'s recorded forensic interview into evidence. However, Huntsinger did not object at trial on the ground that the interview was inadmissible under that statute. "It is well-settled law in Indiana that a defendant may not argue one ground for objection at trial and then raise new grounds on appeal." *Hitch v. State*, 51 N.E.3d 216, 219 (Ind. 2016) (quotation marks omitted). Accordingly, Huntsinger has not preserved this issue for our review, and we do not consider it. *See, e.g.*, *Leonard v. State*, 80 N.E.3d 878, 884 n.4 (Ind. 2017).

### Issue Two: Motion for a Mistrial

[16] Huntsinger next asserts that the trial court abused its discretion when it denied his motion for a mistrial based on the "communication" between the prosecutor and the alternate juror. *See* Jury Trial Tr. Vol. 2 at 85-88. "Whether to grant or deny a motion for a mistrial lies within the sound discretion of the trial court. We afford great deference to the trial court's decision and review the decision

solely for an abuse of that discretion." *Isom v. State*, 31 N.E.3d 469, 480 (Ind. 2015) (citations omitted).

[17] A mistrial "is an extreme remedy that is only justified when other remedial measures are insufficient to rectify the situation." *Id.* at 481 (quotation marks omitted). Here, in response to the "communication" between the prosecutor and the alternate juror,[1] the trial court issued an admonishment to the juror. "[A] properly submitted admonition to the jury is presumed to cure" error. *Id.* (quotation marks omitted). We are not persuaded by Huntsinger's bald assertions on appeal that the trial court's admonishment here was somehow insufficient. Rather, we agree with the State that Huntsinger's argument "comes nowhere close to his heightened burden" to show that the extreme remedy of a mistrial was required despite the admonishment. Appellee's Br. at 23. We affirm the trial court's denial of Huntsinger's motion for a mistrial.

### Issue Three: Sufficiency of the Evidence for Counts 3, 4, and 5

[18] We next consider Huntsinger's argument that the State failed to present sufficient evidence to support the three Level 6 felony convictions for neglect of a dependent. "When an appeal raises a sufficiency of evidence challenge, we do not reweigh the evidence or judge the credibility of the witnesses, and we

---

[1] In his brief on appeal, Huntsinger asserts that he was denied an offer to prove that oral communication had also occurred between the prosecutor and the juror. We cannot agree—at no point during his colloquy with the trial court did Huntsinger affirmatively request an offer to prove some oral communication between the prosecutor and the juror. Accordingly, Huntsinger did not preserve his argument regarding the denial of any such request.

respect a fact-finder's exclusive province to weigh conflicting evidence." *Phipps v. State*, 90 N.E.3d 1190, 1195 (Ind. 2018) (quotation marks omitted). We consider only the probative evidence and the reasonable inferences that support the verdict. *Id.* We will affirm if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt. *Id.*

[19] To prove its three charges of neglect of a dependent, as Level 6 felonies, the State here was required to show that Huntsinger, having the care of Kh.H., Ki.H., and J.W., his dependents, did knowingly place those dependents in a situation that endangered their lives or health. I.C. § 35-46-1-4(a)(1). Our case law is clear that "mental and emotional" health is captured by the neglect statute. *Harrison v. State*, 644 N.E.2d 888, 890 (Ind. Ct. App. 1994), *trans. denied*. "[T]he purpose of the neglect statute is to protect a dependent from the failure of those entrusted with his or her care to take the action necessary to ensure the dependent is safe." *Id.* However, the "risk of . . . mental harm" must "go[] substantially beyond the normal risk of bumps, bruises, or even worse that accompany the activities of the average child. This is consistent with a 'knowing' mens rea, which requires subjective awareness of a 'high probability' that a dependent has been placed in a dangerous situation . . . ." *Gross v. State*, 817 N.E.2d 306, 309 (Ind. Ct. App. 2004).

[20] Huntsinger asserts that the three children "were not exposed to any danger or risk." Appellant's Br. at 23. In particular, Huntsinger argues that there was no evidence that, had he used on any of the three children the amount of force he

used on L.H., any of the other three children would have been harmed. But Huntsinger's argument misunderstands the State's charges. As the prosecutor made clear during the jury trial, the three Level 6 felony charges were premised on Huntsinger having placed the children in a situation that endangered their mental health by abusing L.H. so near to them.

[21] And the evidence most favorable to the verdict supports Huntsinger's three Level 6 convictions. Kh.H., Ki.H., and J.W. were each in close proximity to the battery when it happened. Indeed, while not necessary to demonstrate the offenses, the evidence plainly demonstrates that at least two of the children, Kh.H. and J.W., actually observed the battery and remembered it some time later. We conclude that the evidence demonstrates that Huntsinger was aware of a high probability that his battery of L.H. placed the other three children in a situation that endangered their mental health. *See* I.C. § 35-46-1-4(a)(1). Thus, we affirm Huntsinger's convictions on Counts 3, 4, and 5.

### Issue Four: Double Jeopardy on Counts 1 and 2

[22] Huntsinger next asserts that the trial court violated his right to be free from double jeopardy when it entered judgment of conviction on both Count 1 (his battery of L.H.) and Count 2 (neglect of L.H. that endangered L.H.'s life). The State properly concedes that the trial court violated Huntsinger's right to be free from two convictions for the very same act when it entered its judgment of conviction on both Count 1 and Count 2. *See Bradley v. State*, ___ N.E.3d ___, No. 87A01-1711-CR-2584, 2018 WL 5578874, at *5-7 (Ind. Ct. App. Oct. 30, 2018), *not yet certified*. We agree. Both Count 1 and Count 2 are based on the

very same act, namely, Huntsinger's shaking of L.H. Accordingly, we reverse Huntsinger's conviction on Count 2 and remand with instructions for the trial court to vacate the judgment and sentence on that Count.

### *Issue Five: Sentencing*

Last, Huntsinger argues that the trial court abused its discretion when it sentenced him. Sentencing decisions rest within the sound discretion of the trial court and are reviewed on appeal only for an abuse of discretion. *McElfresh v. State*, 51 N.E.3d 103, 107 (Ind. 2016). One way in which a trial court may abuse its discretion is by omitting from its sentencing statement "reasons that are clearly supported by the record and advanced for consideration, or the reasons given are improper as a matter of law." *Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind.), *clarified on reh'g on other grounds*, 875 N.E.2d 218 (2007). However, "a trial court can not . . . be said to have abused its discretion in failing to 'properly weigh'" aggravators or mitigators. *Id.*

Huntsinger asserts that the trial court abused its discretion because "the victim's age is a material element" of his Level 3 battery conviction. Appellant's Br. at 27. He also asserts that the fact that he was in a position of trust over the children is "an essential element" of his Level 6 neglect convictions. *Id.* at 27-28. Both of those assertions are incorrect. The statutory definition of battery as relevant here does not require the victim specifically to be seven months old. I.C. § 35-42-2-1(j). Neither does the statutory definition of neglect as relevant here require the dependent specifically to be the defendant's child or step-child. I.C. § 35-46-1-4(a)(1). Rather, those fact-specific circumstances were properly

considered by the trial court as the nature and circumstances of the offenses. *See* I.C. § 35-38-1-7.1(a). Accordingly, we reject Huntsinger's argument.

Huntsinger further argues that the trial court failed to properly weigh various aggravating and mitigating circumstances. This argument is not properly before us and we do not consider it. *Anglemyer*, 868 N.E.2d at 491. And, insofar as Huntsinger argues that the trial court failed to consider mitigating circumstances advanced for the trial court's consideration but then not mentioned by the trial court in its sentencing statement, Huntsinger has not met his burden on appeal to show that any such circumstances were significant in light of his aggregate term of nine years—the advisory term for a single Level 3 felony conviction—with five years suspended. *See, e.g.*, *McElfresh*, 51 N.E.3d at 112. Accordingly, we cannot say that the trial court abused its discretion when it sentenced Huntsinger.

## Conclusion

In sum, we affirm Huntsinger's convictions on Counts 1, 3, 4, and 5, as well as his sentence. However, we reverse Huntsinger's conviction on Count 2, and we remand with instructions for the trial court to vacate that conviction and its concurrent sentence.

Affirmed in part, reversed in part, and remanded with instructions.

Crone, J., and Pyle, J., concur.